FILED

2004 Dec-30  PM 03:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SUSAN KELLY, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 03-AR-2557-S |
| | } | |
| MEDIA GENERAL, INC., d/b/a | } | |
| WIAT-CBS 42, | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

Before the court is a motion by defendant, Media General, Inc. ("Media General"), doing business as WIAT-CBS 42 ("WIAT"), for summary judgment. Plaintiff, Susan Kelly ("Kelly"), invokes Title VII in presenting claims of gender discrimination in the forms of pay disparity, termination, and retaliation. She also invokes the Equal Pay Act ("EPA") as a basis for the pay disparity claim.

### Facts

Kelly was hired by Media General's Birmingham affiliate, WIAT, in August 1998. Kelly was hired to be the television station's local sales manager by the station's general manager, Eric Land ("Land") and its general sales manager ("GSM"), Deborah Corson ("Corson"). The general manager oversees the GSM, who heads the sales department, consisting of local sales managers, national sales managers, and "account executives."

Kelly received a $92,000 compensation package upon her

1

original hiring. She, thereafter, received annual pay increases. She was promoted to GSM in October 2001, to take the place of the former GSM J.D. Huey ("Huey"), who had been promoted to general manager of the station, replacing Land. Kelly was offered and accepted a $130,000 compensation package as the new GSM. Under Media General's pay matrix, which is based on market size and station revenue, Kelly was a "Grade 27 GSM." Her $130,000 compensation package was between the low-point on the matrix, $96,100, and the maximum point, $144,200.

Kelly's immediate predecessor as GSM was Huey. Huey was offered an initial compensation package of $140,000 to become GSM. Huey was unemployed at the time he accepted the job of GSM. He was ultimately promoted to general manager, and then terminated for conduct unbecoming a manager. David Parker ("Parker"), who replaced Kelly, negotiated a $150,000 initial compensation package. Both Huey and Parker received more monetary compensation in their previous jobs than they did at WIAT. Both Huey and Parker had worked in larger media markets before coming to Birmingham. Media General claims that it had to create a more lucrative compensation package to attract Huey and Parker to Birmingham. Both parties seem to agree that Corson, the female who preceded Huey, also made less than both of the males who held the job, but there is no quantification or explanation of the difference. The job of GSM had essentially the same duties throughout the relevant time periods.

2

When Kelly became GSM at WIAT she had nineteen years of experience in broadcasting, eight of those years as a GSM. Parker had no experience as a GSM, but had previously worked in Los Angeles as a Local Sales Manager. Huey had only three years of experience as a GSM.

During the relevant time period, Media General had a progressive discipline policy in place. Under that disciplinary policy, formal, written discipline was *not* *required*, but was described as the normal procedure. Media General explicitly retained the right to administer discipline as it saw fit.

During her time at Media General, Kelly claims to have always received favorable performance evaluations. She claims to have received no formal written discipline while at WIAT, and claims to have received heaping helpings of praise from her superiors.

In February of 2003, Huey was terminated as station manager at WIAT. At the same time, Kelly received notice from Media General's VP of human resources, Rick Roberts ("Roberts"), that she had "two strikes against her." Roberts also told her to remain "hands off" of managing both national and local sales. At a later meeting with Roberts, Kelly went as far as to ask if "she was going to be fired." Roberts told her that if he was going to fire her, he would have already done so.

Kelly had numerous performance problems during her period as GSM at WIAT. She failed to make budget for any month in 2003 up

until her termination. She attributes her failures to a variety of causes other than her own personal shortcomings. Making budget is, by all accounts, the most important indicator of a GSM's performance. She missed the first quarter of 2003's budget by almost $600,000. Another indicator of performance for GSM's is the daily sales outstanding reports. These reports basically measure accounts receivable for the GSM. As in any other business, it is important to keep outstanding receivables low. In the months preceding Kelly's termination, WIAT's scores were the highest (worst) of any Media General station. All of the other performance indicators indicated that she struggled throughout 2003. While 2002 had been better relative to the budget, most of that was attributed to additional revenue from a hotly contested governor's race which had not been anticipated in setting the budget.

Media General also had problems with Kelly's conduct on the job. Marc Stover ("Stover") and Daryl Sanders ("Sanders") both complained about Kelly's belligerent style both with her account executives, even using profanity, screaming, insult, and mockery. Kelly and Huey told Sanders that he should quit night school because another man might as well slip into bed with Mrs. Sanders. For this reason, among others, Huey was subsequently terminated for "conduct unbecoming a manager." Sanders ultimately resigned saying that WIAT was the most hostile environment he had ever experienced.

Stover also complained that Kelly was the reason for the

station's poor relationship with its national representative firm, MMT. Specifically, Stover reported that Kelly had a poor relationship with Lori Hartinger("Hartinger"), manager of MMT's Atlanta office. Hartinger, complained to WIAT management about Kelly's inability to effectively deal with MMT, both in performance and personality.

Tiffany Carter ("Carter") complained to Partenheimer about Kelly's abrasive management style. Carter testified that those who were on Kelly's bad side were treated unfairly. Carter specifically corroborated much of Sanders' story about Kelly. These complaints were part of the reason for the February 7, 2003 meeting with Roberts. Roberts alerted her to the problems with her conduct, and told her she had "two strikes against her." Kelly testified that she believed she was being set up to fail.

After Partenheimer conducted a thorough investigation of Kelly's complaints, and the complaints of others, Partenheimer was convinced that Kelly's claims were all unsubstantiated. Partenheimer recommended Kelly's termination in her report of February 2003, but the decision was put off until a new general manager was hired.

Bill Ballard ("Ballard") got the job of general manager of the station on or about June 20, 2003. Shortly thereafter, Kelly began to complain that Ballard had been hostile and verbally abusive towards her. Shortly after his arrival at WIAT, MMT informed

Ballard that advertisers did not want to work with Kelly, and WIAT might want to replace Kelly with a stronger GSM. Ballard also found out that Kelly had been making unfounded complaints about him to contacts at MMT, specifically Hartinger.

Kelly complained of gender discrimination to her superiors at WIAT as early as 2001. On April 29, 2003 she filed an EEOC charge alleging discrimination in treatment and pay. She followed up her charge with a formal complaint to Partenheimer. Ballard was brought up to speed on many on going issues at WIAT when he became the station's general manager in June, 2003. Among them was Kelly's EEOC complaint. On June 26, 2003, Kelly filed an amended charge with the EEOC, in which she alleged, among other things, that Ballard was harassing her to the point of forcing her to resign. Kelly sent an email to Partenheimer to formally complain of that alleged discrimination and harassment. Around the same time, Partenheimer also learned that Kelly had received free interior design services from a client for whom WIAT produces a local home improvement show. This was a serious violation of Media General policy. Media General terminated Kelly on July 1, 2003, four days after her amended EEOC charge .

## Analysis

### *EPA Claim*

The Equal Pay Act says that employers shall not discriminate

against employees based on gender "by paying wages to employees in such establishments at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work in jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working conditions." 29 U.S.C. § 206(d). Kelly has identified two men who performed the same job as she did, and were paid at a higher rate than she was. Media General concedes that Kelly makes out a *prima facie* case under the EPA.

Media General argues, instead, that it deserves summary judgment of the claim on the basis of an affirmative defense. A variety of affirmative defenses are available under the EPA including: (1) a bona fide seniority system; (2) a merit system; (3) a system paying based on quantity or quality of production; or (4) any other factor other than gender. 29 U.S.C. § 206(d)(1). Once the *prima facie* case is demonstrated, as it is here, the employer must prove by a preponderance of the evidence that the differential is justified by one of the affirmative defenses. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). The burden of proof, and not just the burden of production, is on the employer for these affirmative defenses. *Id.*; *see also Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1018 (11th Cir. 1994). This is a difficult burden to overcome, and Media General must show that the factor of gender played no part in wage differential. *Mulhall v. Advance*

7

*Sec., Inc.,* 19 F.3d 586, 589-90 (11th Cir.) *cert. denied*, 513 U.S. 919 (1994). This standard is therefore different from the familiar Title VII analysis, and requires proof rather than the mere proffering of a non-discriminatory reason.

Media General relies on the fourth affirmative defense, "any factor other than sex." Media General claims that it relied on past salary and experience in determining how to pay it's GSM's at WIAT. "[A]n Equal Pay Act defendant may successfully raise the defense of 'any other factor other than sex' if he proves that he relied on prior salary *and* experience in setting a 'new' employee's salary." *Irby v. Bittick*, 44 F.3d 949, 955 (11th Cir. 1995).[1] Experience can be a legitimate "business reason" as long as it is the kind of factor which is capable of being rebutted. *Id.* at 956. When claiming use of prior salary in conjunction with another business reason, "the question is whether other business reasons...

---

[1] There is intense debate between the parties as to the meaning of *Irby*. Both sides, it seems, miss the point of the case. Media General claims that Kelly argues that the only relevant experience is experience in the same job. Media General is right to note that this would lead to an absurd result, where one could not consider prior salary in a promotion because the experience would not transfer to the new job. However, Media General's reading is equally absurd because it allows the use of almost any kind of "experience" to be lumped in with prior salary to create an affirmative defense. *Irby* contemplates the use of experience when it is a factor that can be rebutted; for instance, time spent in a similar job, or in the same division of a company. The use of the prior salary of a ten year veteran of major league baseball in determining his wage as a high school teacher is not the kind of "experience" that *Irby* contemplates. That experience would allow obscene overpayment based on almost entirely irrelevant "experience." There must be some congruence between the "experience" and the business such that using experience explains the use of the prior salary to set the new salary. There must be some congruence between experience claimed and the new job received, as well as some ability for plaintiff to rebut that experience. Otherwise, experience would set no limit on the use of illogical and discriminatory prior salaries as an affirmative defense in EPA cases, as *Irby* contemplates it would.

reasonably explain the utilization of prior salary." *Id.* (internal quotations omitted).

Media General claims it is entitled to summary judgment because it relied on Huey's and Parker's previous salaries, in conjunction with their experience, in setting their salaries. While there is certainly evidence to support both of those facts, this court finds that there are issues of material fact that should be resolved by a jury with regard to the experience of Kelly *vis-a-vis* her male counterparts. There is no question that the use of prior salary indicates that Kelly, Huey and Parker were paid without regard to their sex. Huey and Parker made more at their old jobs, and Kelly made less. Attracting new talent to a smaller market may be a legitimate "business reason." However, the Eleventh Circuit in *Irby* clearly stated that it "has not held that prior salary can never be used by an employer to establish pay, **just that such a justification cannot solely carry the affirmative defense**." *Irby*, 44 F.3d at 956 (emphasis added). Thus, the evidence of prior salary is not enough to prove the affirmative defense.

There is, therefore, a genuine issue of material fact on experience. Because prior salary alone cannot carry the affirmative defense, Media General must **prove** that the experience of Huey and Parker were critical to their higher wage rates. Media General has the burden of proof. *Mulhall,* 19 F.3d at 589-90. The evidence on this point is not enough for this court to grant summary judgment

9

given that burden of proof. Media General points out that both Huey and Parker have large market experience, which it claims, is much more valuable to the employer than is Kelly's experience as a GSM. However, Kelly has much more experience as a GSM than either Huey or Parker. Perhaps most tellingly, Huey indicates that he was told that by his supervisors that Kelly had never been a GSM before. If true, this would indicate that her supervisors were totally unaware of the experience of Kelly, and thus, could not have used it in setting her salary in relation to Huey and Parker. At a minimum, this evidence creates an issue of fact as to whether experience was considered at all in setting salaries. Thus, while there is a persuasive argument that Parker and Huey's experience was considered to greater and worthy of considering their prior salary[2], Media General has not definitively proven that Huey and Parker were certainly more experienced than Kelly. Kelly was a GSM for much longer than either Huey or Parker, and it is possible that her experience would have been counted as greater.[3] Thus, there is

---

[2]Media General makes a convincing argument that large market media experience *could* be counted as more valuable than any amount of small market media experience. Despite this argument, there is still a question of material fact whether that experience is greater than Kelly's, and even if it is, if it justified the use of a larger prior salary.

[3]It is worth noting that much of the debate here centers on the requirements of *Irby*. In *Irby*, the experience question was remarkably clear. The plaintiff held the same job as his alleged comparator, but the comparator had held the job for four years longer than had the plaintiff. In a situation such as that, the congruence of experience is virtually indisputable. In our case, given the differing natures and kinds of experience, it seems an issue of fact to determine which employees the employer regarded as the most experienced.

an issue of material fact as to whether or not experience supports the use of prior salary to the point where the affirmative defense is proven.[4]

Therefore, despite the relative weakness of Kelly's EPA claim, summary judgment is not appropriate because Media General has the burden of proof with respect to its affirmative defense and has not erased all material factual dispute with regard to its defense. The extent to which the denial of summary judgment depends on the fact that it is an EPA claim, and not a Title VII claim should be clear in the rest of the opinion.

### Title VII- Pay Discrimination

Kelly claims that her lower salary was discrimination against her on the basis of gender in violation of Title VII. In order to make a *prima facie* case of gender based pay discrimination Kelly must demonstrate that "she is female and that the job she occupied was similar to higher paying jobs occupied by males." *Miranda v. B&B Cash Grocery, Inc.*, 975 F.2d 1518, 1529 (11th Cir.), *cert.*

---

[4]It is possible that the attraction of employees from larger markets would qualify as "other business reasons" which reasonably explained the utilization of prior salary. However, much more evidence than has been provided by Media General would be necessary to prove the affirmative defense on that ground. Media General would have to demonstrate the "other business reasons" for valuing those employees more than those with similar experience in the Birmingham market. As was noted earlier, the point is that prior salary alone is not enough. Media General must show business reasons to explain why the use of the prior salary made business sense. Essentially, to win at the summary judgment stage, Media General must prove a business reason (one that is not ephemeral, but rather somewhat quantifiable and rebuttable) which justifies the use of Huey and Parker's prior salary. Media General has come no where close to satisfying that burden with its large market v. small market experience argument.

*denied*, 513 U.S. 919 (1994). Media General does not dispute that Kelly makes out a *prima facie* case of pay discrimination under Title VII.

The burden of production shifts to Media General to proffer a legitimate non-discriminatory reason for the pay differential. Unlike under the EPA, under *McDonnell-Douglas*, this reason is not an affirmative defense and does not have to be proven by Media General. The burden of proof remains on the plaintiff at all times to prove intentional discrimination.

Media General provides a non-discriminatory reason for its pay differential between Kelly and her male comparators. Media General explains that it paid Huey and Parker more money because their higher salaries were required to recruit them to WIAT. No evidence in the record contradicts Media General's proof that both Huey and Parker made the same or more in their previous jobs. Reliance on that previous salary, and intent to make salary competitive with other markets is certainly a legitimate non-discriminatory reason. In fact, it is uncontradicted that Parker would not have accepted less to take the job at WIAT.  Further, unlike the similar EPA affirmative defense, reliance on experience is not required by the case law. Regardless of that, however, the reliance on large market experience here is a legitimate non-discriminatory reason which would also explain the difference in salary. While it may or may not be factually proven, here the non-discriminatory reason only

has to be proffered, not proven, by Media General.

This case is illustrative of the difference between an EPA claim and a Title VII claim at the summary judgment stage. It is extremely difficult for a defendant to prove dispositively his EPA affirmative defense at summary judgment because genuine issues of material fact often abound, considering the burden of proof. Under *McDonnell-Douglas*, however, the defendant is left to merely provide some evidence of a non-discriminatory reason for its actions. The burden remains on the plaintiff to prove his case. The levels of proof required, even taking evidence in the light most favorable to the non-movant, are extremely different. Once the legitimate non-discriminatory reason is proffered, the burden shifts back to plaintiff to create a genuine issue of material fact as to pretext.

Kelly fails to provide evidence sufficient to create the inference of pretext in Media General's proffered reasons for the salary difference. While her arguments about the use of experience carry significant weight in the different analysis of the EPA claim, that evidence does not create the inference that WIAT's reasons for paying Huey and Parker more were pretextual. Under *McDonnell-Douglas*, unlike the EPA, prior salary can be utilized alone as long as it is legitimate and non-discriminatory. Here all of the evidence supports the conclusion that prior salary was the reason that the individuals' salaries were set where they were. In fact, there is significant evidence that Parker's salary was

negotiated, and perhaps other employees' salaries were as well. It seems Kelly and her comparators were in a position to turn down the salary offer made by Media General. In fact, Parker turned down Media General's first offer. None of the evidence provided calls into question that Media General offered salaries based on what was required to recruit the potential employee from another market. While that use of prior salary must be combined and proven in the EPA context, here it must merely be legitimate and non-discriminatory. There is certainly no evidence indicating reason to disbelieve the use of prior salary to set the original salary grade of the comparators and Kelly.

Further, though Kelly tries to call into question whether big market experience was used, she never presents any evidence that experience as a GSM, and not big market experience, was utilized in other situations. This is the sort of evidence, in the absence of any direct evidence of discrimination, to support a finding of pretext. While reasonable minds might be able to differ about who was, in fact, "more experienced," there is not sufficient evidence upon which it could determine that Media General's stated preference for one kind of experience here is pretext. Without any evidence calling into question Media General's use of prior salaries, and larger market experience in setting salaries, summary judgment is unavoidable on this issue.

### *Title VII- Discriminatory Termination*

Kelly claims that she was wrongfully terminated by Media General because of her gender. In order to make out a *prima facie* case of gender discrimination in termination, Kelly must show that: (1) she is a member of a protected class; (2) subjected to an adverse employment action; (3) treated differently than similarly situated males; and (4) she was qualified for her job. *See, e.g., Maniccia v. Brown*, 171 F.3d 1364 (11th Cir. 1999). Media General does not contest that Kelly is a member of a protected class (female) or that she was subjected to an adverse employment action. However, Media General does argue that Kelly fails to show the final two elements of her *prima facie* case.

Kelly fails to show that she was treated differently than similarly situated male employees were treated. Ultimately, her charge that her termination was gender based is without merit. It is not based on substantial evidence. First, in her own deposition, Kelly herself stated "I don't think that Bill was terminating me because of my sex." Thus, Kelly, herself, provides credible evidence that sex was not the cause of her termination. Other than that statement, there is no evidence available upon which the finder of fact could conclude that her termination was "because of sex."

Moreover, even if the court looks at alleged comparators, Kelly comes up woefully short of establishing a *prima facie* case.

15

To prove the *prima facie* case via comparison with male employees, Kelly must show "that the quantity and quality of the comparator's misconduct be nearly identical." *Maniccia*, 171 F.3d at 1368. Kelly's entire argument is built upon the idea that she was not warned of her alleged performance problems, and was not given as many chances to improve, as were similarly situated males. However, there is absolutely no evidence that Kelly's higher ups wrote any male employees up before firing them. Kelly only specifically cites three comparators in this regard, Doug Wilson, Jeff Fox and Mark Stover. Each of these purported comparators was written up and disciplined for unsatisfactory performance before their termination. Unfortunately for Kelly, she was the one who disciplined them. This was done as their direct supervisor. Kelly, of course, was not the supervisor in her own case, and no evidence describes the normal amount of discipline given to male employees by their supervisors. Kelly claims she was told by supervisors to discipline them, and not fire them. However, that testimony comes from Huey, who was Kelly's supervisor at the time of the discipline, but who was not at WIAT when Kelly herself was disciplined and fired. Obviously, it is only the motivations of the actual decision makers that matter in a discrimination suit. It might be that she was the only person providing active discipline of employees at WIAT, or that Huey was the primary person responsible for the use of such discipline.

16

Kelly draws a pretty fine distinction between written discipline and oral discipline/warnings for performance deficiencies by her supervisors, of which Kelly had plenty. The fact that oral discipline was not formally added to her personnel file does not indicate that she was not given notice of her performance issues. In fact, as a supervisor and a manager, Kelly should have known all too well that she was missing budgets and other performance benchmarks that were critical to her success. Tellingly, Kelly cannot identify any male employees who had trouble making budget but were given notice and an opportunity to improve.

Kelly alleges that Todd Buccelli ("Buccelli") is a proper comparator because he was disciplined by Ballard, the same supervisor who ultimately terminated her. According to Ballard, Buccelli had demonstrated failures in performance that indicated he lacked the skills necessary to be an effective Marketing Director. Ballard allowed Buccelli to work for months at his job after his performance deficiencies became clear, and was ultimately "transferred," rather than terminated. Kelly argues that Buccelli was treated differently for his "poor performance" than she was. There are a number of problems with this comparison. First, the so-called "discipline" was that Buccelli was given a lukewarm performance evaluation by Ballard. Further, while both sides appear to agree that Buccelli was "transferred," rather than terminated, it is unclear to this court whether that transfer was set up by

Ballard to avoid having to terminate him, or that Buccelli merely got offered another job in the company and Ballard advised him to take it, rather than to fire him. It seems to this court that the latter is closer to the situation, and certainly no inference can be read from those facts.

Buccelli's conduct is just too different to warrant the inference that the only explanation for the differing treatment in comparison to Kelly was their gender. Kelly points the court to cases which soften the "nearly identical" language of *Maniccia*, and *Holifield,* among others. *See, e.g.*, *Anderson v. WBMG-42,* 253 F.3d 561 (11th Cir. 2001)(using a broad comparison among "unprofessional behavior"). This court agrees that requiring "nearly identical" comparators stretches the limits of the law, but in this case, the evidence provided does not invite the court to probe the outer limit of the "similarly situated employee." Not enough information is even given about Buccelli's conduct to make a useful comparison between him and Kelly. From the evidence presented, it appears only that Buccelli's problems were that he was "good," but not "great," and struggled in some performance reviews. Kelly, on the other hand, struggled both from "unsatisfactory performance," and from "unprofessional conduct." While her performance was the only listed cause for her termination, that does not indicate that her supervisors were not also grappling with the problems with her conduct as well. After all, "conduct" is a crucial element of

"performance." It is likely that the performance problems alone were justification enough from Media General's perspective, and were therefore the only ones included in its documentation.

The differences in treatment of Kelly and Buccelli are blown out of proportion, too. While Kelly tries to construct Buccelli's dismissal as a transfer, it seems clear from the evidence that but for Buccelli's relationship with the manager in Chattanooga, he would have been dismissed by Ballard and not transferred to another station. His second chance was facilitated largely by someone outside of the WIAT group, and elsewhere at Media General. Kelly had no such opportunity to move to another market, so the comparison is inapposite. Kelly presents no further evidence which might support a more useful comparison between herself and Buccelli.

Thus, the only evidence of second chances involved Kelly as the decisionmaker. The remainder of her "evidence" is her own conclusory testimony that she was treated differently.   This evidence is extremely flimsy, and supports no inference of any kind. Even if Kelly was instructed by superiors to give these employees a second chance without termination, it does not indicate that differing treatment was because of gender.   Kelly and her comparators held very different jobs, and different station managers might have required different things during the two time periods. Finally, Kelly does not even deal with the evidence that

she was, in fact, given a second chance in the period between her warning in February, and her termination in June. Evidence of such a warning of deficiency, and a period to correct it, calls into question whether there is any arguable difference whatsoever in treatment between Kelly and her alleged comparators. Without evidence of such differing treatment, Kelly cannot make a *prima facie* case. Because of the severe lack of concrete evidence, or even suitable comparators for this point, summary judgment is due on the gender based termination claim.

Media General also has a strong argument that Kelly was not qualified for her job at the time of her dismissal, but that evidence is not necessary to the disposition of this claim and is therefore not fully discussed here. Likewise, it seems extremely likely given the evidence that defendant has presented a significant, legitimate, non-discriminatory reason for Kelly's termination (her poor performance and conduct), which despite failures to discipline or differing treatment, warranted her immediate termination. Given the factual weakness of Kelly's gender discrimination claim, and the lack of evidence of pretext, it would appear that Media General would also be entitled to summary judgment on those grounds if Kelly had established a *prima facie* case.

### *Title VII- Retaliatory Discharge*

A *prima facie* case of retaliatory discharge requires proof of

20

three elements: (1) engagement in protected activity; (2) an adverse employment action; and (3) and some causal connection between the protected activity and the adverse employment action. *See*, *e.g.*, *Davis v. Town of Lake Park*, 245 F.3d 1232 (11th Cir. 2001). Media General does not argue that Kelly did not undertake a protected activity, or that she did not suffer an adverse employment action. Media General argues only that there is an insufficient causal nexus between the protected activity and the adverse action to establish a *prima facie* case.

Kelly relies almost exclusively on the temporal nexus between her protected activities and her termination as proof of a causal connection. Media General argues that the temporal nexus is too attenuated to support an inference of retaliation in Kelly's discharge. Kelly's original complaints were made to her supervisors after she was promoted to GSM in October 2001. Media General sees the nearly three year period between these complaints and her June 2004 termination as too distant, and cites a number of cases to support such a finding. *See, e.g., Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068 (11th Cir. 1995). If that was the only factual circumstance, Kelly would almost certainly fail to make out even a *prima facie* case. However, Media General in its original brief leaves out numerous other protected activities undertaken by Kelly over the course of her time at WIAT. Kelly filed her original EEOC charge on April 29, 2003, and amended that charge to state a

claim of harassment on June 26, 2003. Kelly also complained to
Partenheimer via email about discrimination and harassment on June
26, 2003. Kelly was terminated on July 1, 2003, just four days
later. The four day difference between the complaint, the amended
EEOC claim, and Kelly's termination is more than close enough
temporally to support a *prima facie* case.

Media General suggests that if it had wanted to retaliate
against Kelly for her complaints of discrimination it could have
done so long before it ultimately terminated her in 2003. This
argument fails to account for all the subsequent protected
activity. It is not hard to imagine that Kelly's EEOC complaint, or
her amended complaint, or her complaints to Partenheimer, were the
proverbial straws that broke the retaliatory camel's back. To
assume that the nature and severity of the complaints was
necessarily unchanging over the course of the years such that Media
General's motivation to retaliate was also unchanging seems a
remarkably silly argument. Clearly, Media General wants the court
to ignore all of this subsequent protected activity, or at least
lump it all together and date it back to 2001. This court is not
prepared to do that on a motion for summary judgment. A jury may be
more accomodating.

Both in its discussion of temporal proximity, and its
legitimate non-discriminatory reasons, Media General alludes to
Partenheimer's original recommendation to fire Kelly. Media General

argues that the Partenheimer recommended that Kelly be terminated
in February 2003, based on an investigation of complaints by and
against Kelly.  Media General notes that this recommendation came
long after the 2001 complaints by Kelly, and before the later
complaints to the EEOC and Partenheimer herself. Media General
argues that this demonstrates that there was a lack of retaliatory
motivation in the decision to terminate Kelly. Media General
believes the unique time period in which this recommendation to
terminate Kelly occurred proves the decision was insulated from any
retaliatory intent. It is true that this evidence might indicate
that there were reasons to terminate Kelly in February which were
not retaliatory. For purposes of summary judgment, if anything,
though, it strengthens the inference of retaliation.  On the other
hand, a shrewd employee who knows the drill may file an EEOC charge
as a defensive ploy to intimidate the employer and avoid
discipline. These are perfect arguments to bring to a jury's
attention.

    If Kelly had been fired in February, 2003, the case for
retaliation would be much weaker. There would have been virtually
no nexus between the termination and the earlier protected
activities. However, Media General waited five months to fire
Kelly, saying only that it wanted to give Kelly a second chance
until the new general manager arrived. The second chance apparently
ended just one day after Kelly e-mailed Partenheimer, and amended

her EEOC complaint. Media General relied upon the information in Partenheimer's February recommendation to fire Kelly just four days after she again complained to Partenheimer and amended her EEOC complaint. In Partenheimer's deposition, she testified that just one day after Kelly complained to her about abusive behavior, she wrote a memo chronicling all the reasons to terminate Kelly expressed in the February 2003 recommendation, as well as noting the subsequent EEOC complaint and complaints against the new manager, Ballard. Choosing not to act on the recommendation to terminate Kelly until just after further protected activity only increases the inference of retaliation. There is enough of a nexus to establish genuine issues of fact as to the *prima facie* case.

Media General proffers a number of legitimate non-discriminatory reasons for firing Kelly, for instance her failures to meet performance benchmarks, and her belligerent management style. These clearly qualify as significant non-retaliatory reasons for her termination. Thus, the onus returns to Kelly to prove that these reasons are pretextual with regard to her retaliation claim. Kelly's presents enough evidence to support a create an issue of material fact on pretext.

Media General's failure to act between February and June, combined with the temporal proximity to Kelly's subsequent complaints create an issue of material fact with regard to pretext. Media General cites a number of cases, not binding on this court,

24

for the proposition that a close temporal nexus, taken alone, cannot create an issue of pretext. *See, e.g.,* *Wyninger v. New Venture gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004).[5] This court, however, does not rely on temporal proximity alone. The fact that Kelly's termination occurred just four days after her last complaint to the EEOC and to Partenheimer, constitutes substantial evidence that any decision to fire her was retaliatory. Such a short time period may in fact be enough to subsume many reasons proffered by a defendant, and suggest pretext.

Even without the temporal proximity, however, there is enough

---

[5]Media General also cites the **Eleventh Circuit** case of ***Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491 (1989)**, for the proposition, **"temporal proximity between her complaints and her proposition likewise *cannot demonstrate pretext."* (quoting from Media General's brief, emphasis added). This is a serious mischaracterization of this case. In *Tipton*, the Eleventh Circuit stated,

> "Tipton contends that the district court's finding that she was discharged for legitimate business reasons, and in failing to associate her sex discrimination protest with her discharge. We disagree. The district court noted that Tipton had asserted she was being discriminated against two days before her discharge. Yet, after considering all of the evidence, the district court found that insubordination, not discrimination, was the reason for the discharge. **In this case, two permissible views of the evidence were presented to the factfinder. The fact that the district court believed one over the other does not render its findings clearly erroneous."**

*Tipton*, 872 F.2d at 1495(emphasis added).

It is noteworthy that *Tipton* was not an appeal of summary judgment, but rather was an appeal of the judge's findings in a non-jury trial. Thus, the standard of review would be different in this case. Also, *Tipton* was decided prior to *Hicks* and *Reeves*, cases which might affect whether or not the proposition stated by Media General, if it were even true, would even be good law.

Regardless, upon actually reading *Tipton*, it appears that if it stands for anything at all, it stands for the proposition that a court may find that temporal proximity alone can be an acceptable basis of pretext. All the Eleventh Circuit actually said is that it is not *clearly erroneous* to find that temporal proximity alone does not prove pretext. Given the posture of this case, and in light of *Tipton*, it seems that temporal proximity alone probably can create an issue of material fact as to pretext.

evidence to create an issue of material fact. Partenheimer's June 27, 2003 memo recommending termination refers both to Kelly's EEOC charge, and to her most recent charges against Ballard. This delay provides more evidence that retaliation could have been a reason for firing Kelly. This entire factual circumstance reads like a hypothetical of pretext one might read in the notes of a law school casebook. Employer has legitimate reasons to fire employee, but ultimately decides not to fire her. After employee undertakes a protected activity, employer exercises those "legitimate reasons" to fire employee. Thus, while the reasons may have warranted the firing of employee, the mere fact that they were not exercised originally calls into question the use of those reasons as the basis for termination. Just because reasons are legitimate and supported by evidence does not mean that they are not pretextual. The decision to renew the recommendation to fire Kelly one day after Kelly's complaints implies retaliation in light of the fact that the company had been sitting on that recommendation for months. It may prove that the legitimate non-discriminatory reasons proffered were ultimately not pretextual. The delay was very possibly attributable to, as Media General suggests, a desire to let the new station manager address the problem. However, at the summary judgment stage, there is more than enough evidence of pretext here to go forward to trial on the retaliation claim.

## Conclusion

26

Media General's motion for summary judgment will be granted in part, and denied in part, by separate order.

DONE this _30th_____ day of December, 2004.


_____

WILLIAM M. ACKER, JR.

UNITED STATES DISTRICT JUDGE